******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

ECKER, J., dissenting. Only four years ago, this court decided—as a matter of state law—that the constitutional requirement of an individualized sentencing proceeding for juvenile offenders facing life sentences established a "watershed" rule of criminal procedure. *Casiano* v. *Commissioner of Correction*, 317 Conn. 52, 69–70, 115 A.3d 1031 (2015), cert. denied sub nom. *Semple* v. *Casiano*, U.S. , 136 S. Ct. 1364, 194 L. Ed. 2d 376 (2016). Our holding in *Casiano* was expressed in these emphatic terms: "If failing to consider youth and its attendant characteristics creates a risk of disproportionate punishment in violation of the eighth amendment, then the rule in *Miller* [v. *Alabama*, 567 U.S. 460, 479, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012)], assuredly implicates the fundamental fairness of a juvenile sentencing proceeding because it is a 'basic precept of justice' that punishment must be proportionate 'to both the offender and the offense.' (Internal quotation marks omitted.) Id., 469. The court in *Miller* also 'alter[ed] our understanding of the bedrock procedural elements essential to the fairness of a [juvenile sentencing] proceeding'; (emphasis omitted; internal quotation marks omitted) *Sawyer* v. *Smith*, [497 U.S. 227, 242, 110 S. Ct. 2822, 111 L. Ed. 2d 193 (1990)]; because the court required that certain factors be considered in an individualized sentencing proceeding before a certain class of offenders may receive a particular punishment. In other words, our understanding of the bedrock procedural element of individualized sentencing was altered when the court intertwined two strands of its eighth amendment jurisprudence to require consideration of new factors for a class of offenders to create a presumption against a particular punishment. As one court aptly noted, albeit in dicta: '[I]f ever there was a legal rule that should—as a matter of law and morality—be given retroactive effect, it is the rule announced in *Miller*. To hold otherwise would allow the state to impose unconstitutional punishment on some persons but not others, an intolerable miscarriage of justice.' (Emphasis omitted.) *Hill* v. *Snyder*, Docket No. 10-14568, 2013 WL 364198, *2 (E.D. Mich. January 30, 2013)." *Casiano* v. *Commissioner of Correction*, supra, 70–71.

These are very strong words, and I have quoted them accurately. In *Casiano*, we determined, "as a matter of law and morality," as a "basic precept of justice," and as a "bedrock procedural [element] essential to the fairness of a [juvenile sentencing] proceeding," that *before* a trial court exercises its discretion to sentence a juvenile offender to a lifetime in prison, the court must consider the mitigating effects of youth and its attendant circumstances. (Internal quotation marks omitted.) Id., 71. Indeed, we deemed this legal and moral

principle so fundamental to our jurisprudence in Connecticut—so deeply " 'implicit in the concept of ordered liberty' "; id., 69, quoting *Teague* v. *Lane*, 489 U.S. 288, 311, 109 S. Ct. 1060, 103 L. Ed. 2d 334 (1989)—that we chose to characterize it as a "watershed" rule, a designation of such singular status that the United States Supreme Court itself has yet to affix to any of its own decisions.[1] When *Casiano* was issued, moreover, we were acutely aware that such a designation would require retroactive application of the underlying procedural rule, i.e., the *Miller* requirement of an individualized sentencing hearing at which the sentencing judge would consider the hallmarks of youth before passing judgment on a juvenile offender facing the possibility of receiving the harshest of sentences. "To hold otherwise," this court stated, "would allow the state to impose unconstitutional punishment on some persons but not others, an intolerable miscarriage of justice." (Internal quotation marks omitted.) *Casiano* v. *Commissioner of Correction*, supra, 317 Conn. 71.

Today, four short years later, we accept just such a miscarriage of justice visited on the defendant, William McCleese, and the majority justifies the result as if *Casiano*, and another case decided a few months earlier, *State* v. *Riley*, 315 Conn. 637, 110 A.3d 1205 (2015), cert. denied, U.S. , 136 S. Ct. 1361, 194 L. Ed. 2d 376 (2016), did not mean what they said. I am unable to understand how this court can overlook *Casiano* and *Riley* without any apparent sign of cognitive dissonance, or why it would choose to do so. I respectfully dissent.

For the reasons set forth in this dissenting opinion, I disagree that the parole eligibility conferred by No. 15-84 of the 2015 Public Acts (P.A. 15-84)[2] provides an adequate remedy for the constitutional violation that occurred at the time of the defendant's sentencing. The trial court failed to conduct an individualized sentencing hearing at which it properly considered the hallmarks of youth—and, in particular, the diminished moral culpability of the juvenile defendant, which *must* be taken into account before imposing an eighty-five year sentence pursuant to *Miller*. The defendant continues to serve the eighty-five year sentence unconstitutionally imposed on him by that judicial authority. This means not only that the judiciary previously failed to meet our constitutional obligation in connection with the performance of our core function, which is to provide individualized justice, but that we persist in doing so.

I

A

It is today undeniable that "children are constitutionally different from adults for purposes of sentencing." *Miller* v. *Alabama*, supra, 567 U.S. 471; see id. (stating

that this principle was "establish[ed]" by *Roper* v. *Simmons*, 543 U.S. 551, 125 S. Ct. 1183, 161 L. Ed. 2d 1 [2005], and *Graham* v. *Florida*, 560 U.S. 48, 130 S. Ct. 2011, 176 L. Ed. 2d 825 [2010]). The driving force behind this extraordinary[3] pronouncement, and the reason for the broad consensus around it, is the ever growing body of scientific evidence demonstrating that children have biological and psychological differences that make them substantially less able than adults to control their impulses, exercise self-control, resist peer pressure, consider alternative courses of conduct, and appreciate the long-term consequences of their actions. See *Miller* v. *Alabama*, supra, 472 n.5.[4] These findings are understood to have inescapable and meaningful *moral* significance, because they mean that children are less morally blameworthy—less culpable, we say—for their actions, "even when they commit terrible crimes." Id., 472. For this reason, the findings hold powerful implications for the law of juvenile sentencing.

The time is fast approaching, in my opinion, when we must acknowledge that the constitutional implications of this idea—that children are constitutionally different for the purposes of criminal sentencing—extend beyond the minimalist holding settled on by the majority, which appears to derive from it nothing more than a formalistic rule prohibiting the imposition of a sentence of death or life without parole on juvenile defendants. I believe that the rationale expressed in the relevant cases, and especially this court's own decisions in *Riley* and *Casiano*, obligates us to find significantly greater meaning in the underlying principles than that found by the majority.

B

It is important to provide the relevant backdrop to this appeal because these facts illustrate in living color the nature and extent of the constitutional violation that occurred when the defendant was sentenced to an eighty-five year term of imprisonment in June, 2003. The particular details of the sentencing proceedings explain why I refuse to accept the view that the defendant's sentence does not remain stained by the constitutional violation under review.

The defendant was sentenced to an eighty-five year term of imprisonment for crimes he committed at the age of seventeen.[5] The state has conceded that the sentencing proceeding was not compliant with *Miller*,[6] and the trial court presiding over the defendant's motion to correct an illegal sentence found that the sentencing court "clearly did not consider the [defendant's] age, youthful attributes and capacity for reform and rehabilitation as delineated in *Miller* . . . ." Indeed, without the benefit of the *Roper*, *Graham*, and *Miller* trilogy, the sentencing court considered the defendant's age, not as a mitigating factor lessening his culpability, but as an aggravating factor *confirming* the court's view

of the defendant's incorrigibility.[7] After mentioning the defendant's use of marijuana since the age of fourteen, his daily use of the drug "illy" for one year, his negligible employment history, and that he dropped out of high school in the ninth grade, the court stated that it did not "view these factors . . . as acceptable excuses or mitigation for [his] serious criminal conduct." To the contrary, the court stated: "*If anything, these factors heighten the court's concern for you and your future.*" (Emphasis added.) Consistent with this theme, the court continued: "Furthermore, this court is not unmindful that, arguably, you do not possess an extensive criminal record. However, this fact gives the court little comfort in view of the nature and extent of your criminal activities and felony conviction, *especially when those factors are considered in light of your young age.*" (Emphasis added.)

The trial court sentenced the defendant to a lifetime behind bars in language that depicts the defendant as the fully mature, fully culpable author of his own fate, whose deadly actions were the product of his own unimpaired free choice: "You know, Mr. McCleese, a major part of life is the making of choices. You had the opportunity to freely choose the road you wished to travel. You had the opportunity to plan your life's journey and you made your choice. You chose to travel a path that resulted in the wounding of one man, the death of another, and the destruction of your own life. Consequently, your journey as a free man, as a free, young man living in a free society, has come to an end. You have forfeited your societal rights to go and come as you [choose] by making terrible choices. You have written your final chapter as a free man." The defendant must be resentenced if we are to remove the constitutional cloud hanging over this case.

### C

For present purposes, the most important feature of the *Roper*, *Graham*, and *Miller* trilogy, and their enhanced state counterparts, *Riley* and *Casiano*, is that these cases identify and elaborate on two *different* implications of the "children are different" doctrine for the constitutional law of juvenile sentencing. One of those implications—the only one that the majority considers meaningful for eighth amendment purposes—is the forward-looking rehabilitative component, which requires the state to provide juvenile offenders "some meaningful opportunity to obtain release [i.e., parole] based on demonstrated maturity and rehabilitation."[8] *Graham* v. *Florida*, supra, 560 U.S. 75. This doctrinal strand emanates from the insight that the very hallmarks of youth that make children different also make them capable of change, because the "transitory" nature of those characteristics; *Miller* v. *Alabama*, supra, 567 U.S. 473; "enhance[s] the prospect that, as the years go by and neurological development occurs, [the juvenile

offender's] deficiencies will be reformed." (Internal quotation marks omitted.) Id., 472, quoting *Graham* v. *Florida*, supra, 68, and *Roper* v. *Simmons*, supra, 543 U.S. 570. In the context of a case in which a juvenile offender faces a life sentence, the rehabilitative strand requires parole eligibility.

But there is a second and equally important component to the *Roper*, *Graham*, and *Miller* trilogy, which the majority ignores. This second doctrinal strand focuses on the concept of culpability or moral blameworthiness—a foundational principle in the law of crime and punishment.[9] The culpability strand, central to *Riley* and *Casiano*,[10] is based on the fundamental recognition that the age of the juvenile offender and the associated hallmarks of youth necessarily impact the assessment of moral blameworthiness at the heart of the sentencing process.[11] See *Miller* v. *Alabama*, supra, 567 U.S. 472 (explaining that "[w]e reasoned [in *Graham*] that those [scientific] findings . . . of transient rashness, proclivity for risk, and inability to assess consequences . . . lessened a child's 'moral culpability' "); *Graham* v. *Florida*, supra, 560 U.S. 71 (noting that "[t]he heart of the retribution rationale is that a criminal sentence must be directly related to the personal culpability of the criminal offender" [internal quotation marks omitted]); *Roper* v. *Simmons*, supra, 543 U.S. 571 (recognizing "the diminished culpability of juveniles").

In the same way that the rehabilitative strand relates directly to parole eligibility, the culpability strand bears directly on the *length* of the sentence imposed on a juvenile offender. Under the sentencing scheme that applied to the defendant in the present case, as in *Riley* and *Casiano*, the exact length of the sentence is determined by the judicial authority exercising its discretion, within the broad range fixed by the legislature, in the context of an adjudicatory sentencing proceeding. Many judges believe that this particular task is the single most difficult and important job that they perform in a line of work that requires them to make decisions of great consequence every day. See, e.g., *United States* v. *Brown*, 843 F.3d 74, 84 (2d Cir. 2016) (Sack, J., concurring) ("[s]entencing is perhaps the most important responsibility of a trial judge, and surely the most difficult" [internal quotation marks omitted]), cert. denied, U.S. , 138 S. Ct. 708, 199 L. Ed. 2d 579 (2018). At the core of the sentencing function is the exercise of judicial discretion to determine the appropriate sentence proportionate to the offense and the offender—a decision based in significant part on an individualized assessment of the particular defendant's culpability.

The culpability strand, for this reason, contains a crucial *procedural* component, which recognizes that the required assessment of blameworthiness only can be conducted by the sentencing court in the context of

an individualized hearing. This is the procedure that was the central focus of our decision in *Casiano*. In *Casiano*, we noted that we were not bound by the federal courts' characterization of the *Miller* rule; *Casiano* v. *Commissioner of Correction*, supra, 317 Conn. 63–64; and held, as a matter of state law, that *Miller* announced "a watershed rule of criminal procedure" that was retroactively applicable to cases on collateral review. Id., 62; see id., 63–64 (noting that "although this court . . . will apply the *Teague* framework, we d[o] so with the caveat that, while federal decisions applying *Teague* may be instructive, this court will not be bound by those decisions in any particular case, but will conduct an independent analysis and application of *Teague*" [internal quotation marks omitted]); see also *Danforth* v. *Minnesota*, 552 U.S. 264, 280–81, 128 S. Ct. 1029, 169 L. Ed. 2d 859 (2008) (noting that *Teague* "was intended to limit the authority of federal courts to overturn state convictions—not to limit a state court's authority to grant relief for violations of new rules of constitutional law when reviewing its own [s]tate's convictions"). As I noted previously, we explained that this procedural component could not be ignored, because "the individualized sentencing prescribed by *Miller* is central to an accurate determination . . . that the sentence imposed is a proportionate one" and "implicates . . . fundamental fairness." (Citation omitted; internal quotation marks omitted.) *Casiano* v. *Commissioner of Correction*, supra, 70.

## II

Against this background, the majority concludes that there is no *Miller* violation to remedy in the present case at all, because the defendant now is eligible for parole under P.A. 15-84. It does so despite three elemental points that cannot be disputed: (1) the defendant's constitutional rights were violated in 2003 when he was sentenced to eighty-five years of imprisonment without the individualized hearing required under *Miller*, as extended by *Riley*; (2) the defendant never has been resentenced since that time, which is to say that he never has been afforded a sentencing proceeding that complies with the "watershed" rule deemed by this court in *Casiano* v. *Commissioner of Correction*, supra, 317 Conn. 71, to be a " 'bedrock procedural [element] essential to the fairness of a [juvenile sentencing] proceeding' " for all defendants, past and present, who remain imprisoned pursuant to a sentence imposed in violation of *Miller*; and (3) pursuant to the sentence imposed in 2003, which remains in effect, the defendant will remain in the custody of the Commissioner of Correction for a period of eighty-five years—for the remainder of his life, unless he lives past the age of 105. See P.A. 15-84, § 1, codified at General Statutes § 54-125a (g).

The majority's reasoning is flawed. Its logic begins with the false premise that the *Miller* violation evapo-

rated as of October 1, 2015, the effective date of § 1 of P.A. 15-84, which made the defendant parole eligible. This idea is critical to the majority opinion because it serves to dispense with the need for a *Miller*-compliant resentencing; if the constitutional violation at issue is "negated" by retroactive parole eligibility, then no constitutional violation remains and there is nothing to remedy. The majority claims that its logic follows from the holding of the United States Supreme Court in *Montgomery* v. *Louisiana*,      U.S.     , 136 S. Ct. 718, 193 L. Ed. 2d 599 (2016), as adopted by this court in *State* v. *Delgado*, 323 Conn. 801, 151 A.3d 345 (2016). I find this reasoning fundamentally flawed.

To begin with, neither *Montgomery* nor any other precedent of the United States Supreme Court holds or suggests that the retroactive availability of parole eligibility in any way "negates" a constitutional violation, as the majority holds today. To the contrary, *Montgomery* unequivocally held that "[a] conviction or sentence imposed in violation of a substantive rule is not just erroneous but contrary to law and, as a result, *void*. . . . [A] court has no authority to leave in place a conviction or sentence that violates a substantive rule, regardless of whether the conviction or sentence became final before the rule was announced." (Citation omitted; emphasis added.) *Montgomery* v. *Louisiana*, supra, 136 S. Ct. 731. The *Montgomery* court then proclaimed: "The [c]ourt now holds that *Miller* announced a substantive rule of constitutional law." Id., 736. Accordingly, the sentence imposed on the defendant in the present case became *void* under *Montgomery*. This is the very opposite of the constitutional violation being "negated," as the majority would have it.

After concluding that *Miller* decided a substantive rule of constitutional law, *Montgomery* took up the remedial question necessarily triggered by the requirement of retroactive application.[12] When it opines that "[a] [s]tate may remedy a *Miller* violation by permitting juvenile homicide offenders to be considered for parole, rather than by resentencing them"; id., 736; the statement must be read in the context of the mandatory sentencing scheme governing that case. *Montgomery* does *not* hold that the retroactive availability of parole eligibility in all cases and all circumstances will remedy a *Miller* violation; nor could it sensibly say so without eviscerating the "substantive rule of constitutional law" it just took pains to recognize. Id. Any suggestion to the contrary seriously misconstrues the precedent in two respects.

First, the remedial holding of *Montgomery* must be determined by reference to the facts of that case. The petitioner, Henry Montgomery, was seventeen years old at the time he committed the homicide for which he was sentenced by a state court in Louisiana to a mandatory sentence of life imprisonment without the possibil-

ity of parole. Id., 725–26. Under Louisiana law, "[t]he sentence was automatic upon the jury's verdict, so [the petitioner] had no opportunity to present mitigation evidence to justify a less severe sentence." Id., 726. Ordering resentencing in *Montgomery*, in other words, would have been an exercise in futility because the only available sentencing option under Louisiana law was life *with* parole. See La. Code Crim. P. Ann. art. 878.1 (Supp. 2019). Given the lack of discretion in a mandatory sentencing scheme, as well as concerns of federalism and comity, the court held that, "where a juvenile offender receive[s] *mandatory* life without parole," states need not "relitigate sentences, let alone convictions, in every case . . . ." (Emphasis added.) *Montgomery* v. *Louisiana*, supra, 136 S. Ct. 736. *Montgomery* is silent on the appropriate remedy for an eighth amendment violation when the juvenile offender was sentenced under a *discretionary* sentencing scheme, such as Connecticut's, in which the defendant could receive a sentence of as little as twenty-five years of imprisonment upon resentencing. See General Statutes § 53a-35a (2) (authorizing "a term not less than twenty-five years nor more than life").

The second reason that *Montgomery* exerts no controlling force here is more fundamental. It is a well established principle of federal law that "the *remedy* a state court chooses to provide its citizens for violations of the [f]ederal [c]onstitution is primarily a question of *state* law." (Emphasis added.) *Danforth* v. *Minnesota*, supra, 552 U.S. 288. This is so because federal law is "fashioned to achieve the goals of federal habeas while minimizing federal intrusion into state criminal proceedings. It was intended to limit the authority of federal courts to overturn state convictions—not to limit a state court's authority to grant relief for violations of new rules of constitutional law when reviewing its own [s]tate's convictions." Id., 280–81. For this reason, states are free—as this court did in *Casiano*—to develop "*state* law to govern retroactivity in state postconviction proceedings"; (emphasis in original) id., 289; and those remedies may be more expansive than the remedy provided under federal law. See id., 287 ("[s]tate law may provide relief beyond the demands of federal due process, but under no circumstances may it confine petitioners to a lesser remedy" [internal quotation marks omitted]); see also *Thiersaint* v. *Commissioner of Correction*, 316 Conn. 89, 107, 113, 111 A.3d 829 (2015) (recognizing that, "under *Danforth*, state courts may give broader effect to new constitutional rules of criminal procedure than *Teague* allows in federal habeas review" and, therefore, "while federal decisions applying *Teague* may be instructive, this court will not be bound by those decisions in any particular case, but will conduct an independent analysis"). *Danforth* also makes it clear that a state law granting its citizens broader remedies for federal constitutional violations

need not be premised on "legislation or . . . judicial interpretation of [the state] [c]onstitution"; *Danforth* v. *Minnesota*, supra, 288; rather, it may be grounded instead on the unique development of the state's law. Id., 289.

We return to the majority's determination that parole eligibility "*negates* a *Miller* violation,"[13] such that "there is no *Miller* violation" at all. (Emphasis in original.) It is undisputed that a *Miller* violation occurred at the time the defendant's sentence was imposed in 2003 because the trial court failed to consider the mitigating factors of youth before sentencing the defendant to the harshest penalty permitted for a juvenile offender. See *Montgomery* v. *Louisiana*, supra, 136 S. Ct. 736 (holding that *Miller* "announced a substantive rule of constitutional law" because "the sentence of life without parole is disproportionate for the vast majority of juvenile offenders"); *Casiano* v. *Commissioner of Correction*, supra, 317 Conn. 79 (requiring resentencing of juvenile offender because "the procedures set forth in *Miller* must be followed when considering whether to sentence a juvenile offender to fifty years imprisonment without parole"). Although the defendant now is eligible for parole after serving thirty years of his eighty-five year sentence pursuant to § 1 of P.A. 15-84, the *Miller violation* does not magically cease to exist. The majority's contrary conclusion—that parole eligibility "negates" the constitutional violation—confuses the analysis of a constitutional *violation* with the very different exercise of fashioning a *remedy* to a constitutional violation.

To support its conclusion that the *Miller* violation has been negated in this case, the majority relies on *State* v. *Delgado*, supra, 323 Conn. 811, in which this court held that a juvenile defendant who was sentenced to life imprisonment without the possibility of parole or its functional equivalent "no longer falls within the purview of *Miller*, *Riley*, and *Casiano*" after the passage of P.A. 15-84. The fundamental logic driving *Delgado* is straightforward: "*Miller* simply does not apply when a juvenile's sentence provides an opportunity for parole . . . ." Id. Three errors result from the majority's reliance on *Delgado*. First, in relying on *Delgado*, the majority incorporates and repeats that decision's failure to distinguish between the constitutional *violation* that unquestionably occurred at sentencing and the constitutional *remedy* for that violation. *Delgado*, like the majority here, mistakes the question for the answer when it concludes that the constitutional violation disappeared at the moment parole eligibility became available. The question in *Delgado*, as in *Montgomery*, was whether the *Miller* violation, which had been determined to exist as a matter of substantive constitutional law, was *remedied* by the availability of parole. That question cannot be answered by wordplay—"What *Miller* violation?" Defining the violation out of existence begs the ques-

tion, which remains this: Does the retroactive availability of parole eligibility remedy the constitutional violation that occurred when the trial court failed to take into account the hallmarks of youth at a compulsory individualized sentencing hearing[14] held *before imposing sentence*? This question can be answered yes or no, but it cannot be answered, as *Delgado* and the majority do, by declaring that there is no longer a constitutional violation to remedy.

Second, *Delgado* relies substantially on the remedial holding of *Montgomery* v. *Louisiana*, supra, 136 S. Ct. 736; see *State* v. *Delgado*, 323 Conn. 807–808, 812; and, to that extent, it offers no assistance in answering the specific issue confronted here, because *Delgado* neither considered nor decided the more precise state law remedial question that emerges under *Danforth*. The defendant in *Delgado* never even cited to *Danforth*, and never invoked its precedential force to argue that "the remedy a state court chooses to provide its citizens for violations of the [f]ederal [c]onstitution is primarily a question of state law." *Danforth* v. *Minnesota*, supra, 552 U.S. 288. The closest the defendant came to making that argument in *Delgado* was the off-point contention that resentencing was contemplated by the Connecticut legislature based on its decision "to require both a *Miller* compliant sentencing hearing *and* an opportunity for parole [in P.A. 15-84] . . . ." (Emphasis in original; internal quotation marks omitted.) *State* v. *Delgado*, supra, 815. *Delgado* therefore neither addresses nor answers the different question raised by the defendant here, which is whether the availability of parole under P.A. 15-84 cures a constitutional violation that this court has deemed to be a "watershed" rule—that is, a rule essential to the fundamental fairness of the judicial proceeding, central to an accurate determination of a proportionate sentence, and implicit in the very idea of ordered liberty—*as a matter of state postconviction, remedial law*. Consideration of this question is essential to resolving the defendant's claim on appeal and, therefore, I address it in part II of this dissenting opinion.

Third, and relatedly, *Delgado* completely fails to acknowledge that this court went significantly further in *Riley* and *Casiano* than did the United States Supreme Court in the respective federal counterpart cases, *Miller* and *Montgomery*. *Delgado* for the most part lumps its treatment of the federal and state cases together; see *State* v. *Delgado*, supra, 323 Conn. 811–12; and it steadfastly ignores the fact that not only the holdings, but also the reasoning, of the Connecticut cases extends more broadly than that found in the federal cases in important ways. After all, *Riley* did not merely follow *Miller*, but it expressly *rejected* a "narrow" reading of the case; *State* v. *Riley*, supra, 315 Conn. 653; and expanded upon the *Miller* principles by applying them to "(1) discretionary sentencing schemes and (2) sentences that are the functional equivalent of life in addi-

tion to sentences of life without parole." *State* v. *Belcher*, Docket No. CR-94-100508, 2016 WL 2935462, *2 (Conn. Super. April 29, 2016) (*Devlin, J.*).[15] And *Casiano* took the *Miller* rule one step further, deeming it to be a watershed rule of criminal procedure.[16] *Casiano* v. *Commissioner of Correction*, supra, 317 Conn. 69–70.

The cursory treatment *Delgado* gives this court's own cases, decided only one year earlier, is especially notable when we look more closely at the distinguishing features of *Riley* and *Casiano*. *Riley* extended the application of *Miller* beyond mandatory sentences in significant part because the court acknowledged the critical importance of *Miller*'s demand for a hearing at which the sentencing judge is "*require*[d] . . . to take into account how children are different" in a discretionary sentencing scheme. (Emphasis added; internal quotation marks omitted.) *State* v. *Riley*, supra, 315 Conn. 654; see id., 658 ("*Miller* does not stand solely for the proposition that the eighth amendment demands that the sentencer have discretion to impose a lesser punishment than life without parole on a juvenile homicide offender. Rather, *Miller* logically indicates that, if a sentencing scheme permits the imposition of that punishment on a juvenile homicide offender, the trial court *must* consider the offender's 'chronological age and its hallmark features' as mitigating against such a severe sentence." [Emphasis in original.]), quoting *Miller* v. *Alabama*, supra, 567 U.S. 477. Simply put, *Riley* recognizes what *Delgado* and the majority opinion here ignore: a court cannot exercise sentencing discretion without first considering those factors deemed essential to the proper exercise of that discretion.

Perhaps even more troubling is that *Delgado* does not so much as mention the predominant fact that *Casiano* declares *Miller* to have established a "watershed" rule, which itself is a ruling of enormous significance. The defendant in *Delgado* once again facilitated this oversight because he offered nothing more than a conclusory argument "that '*Montgomery* does not . . . supersede the final and controlling precedent [of this court] in *Riley* and *Casiano*, which provide a new sentencing hearing as the remedy for sentences that are illegal or were imposed in an illegal manner . . . .' " *State* v. *Delgado*, supra, 323 Conn. 815. I find myself unable to stand by silently and allow *Riley* and *Casiano* to be forgotten.

II

Having determined that there was a *Miller* violation in this case, I next address whether the retroactive parole eligibility conferred by P.A. 15-84 is sufficient to cure the violation as a matter of state law.[17] In *Riley* and *Casiano*, this court adopted and expanded on the principle that "children are different" for the purposes of criminal sentencing. (Internal quotation marks omitted.) *Casiano* v. *Commissioner*, supra, 317 Conn. 60;

*State* v. *Riley*, supra, 315 Conn. 654. The assessment of culpability conducted as part of a criminal sentencing is a central aspect of the "children are different" jurisprudence elucidated in *Riley* and *Casiano*. These cases understand that young people who commit crimes, even horrible crimes, cannot reflexively be written off as bad and immoral people of defective character. Their conduct may be despicable, and even unforgiveable, and the harm they cause may be irrevocable, but, in the context of juvenile offenders, our case law requires the sentencing authority to resist the reflexive assignment of unmitigated moral blameworthiness that may be directed at adults who commit the same crimes. Our growing knowledge about adolescent development no longer permits us to say that the juvenile offender is exercising his free will to the same extent as an adult offender.[18] See generally S. Erickson, "Blaming the Brain," 11 Minn. J.L. Sci. & Tech. 27, 28–29 (2010) ("Much of the recent legal scholarship concerned with criminal responsibility as of late has invested heavily in the notion that the findings of biological sciences promise a fundamental shift away from orthodox notions of criminal liability. . . . All share the belief that the impact of neuroscience on the law in the coming years will be inevitable, dramatic, and will fundamentally alter the way the law does business. And nowhere is this promise endorsed with more gusto than in discussions of responsibility and criminal liability." [Footnotes omitted.]).

*Riley*, applying the logic of *Miller* and the science underlying its holding, identifies with precision the hallmark features of youth that must be considered by a judge in mitigation at any sentencing proceeding at which the judge may sentence a juvenile offender to life without parole. Those features include "immaturity, impetuosity, and failure to appreciate risks and consequences; the offender's family and home environment and the offender's inability to extricate himself from that environment; the circumstances of the homicide offense, including the extent of [the offender's] participation in the conduct and the way familial and peer pressures may have affected him; the offender's inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys; and the possibility of rehabilitation . . . ." (Internal quotation marks omitted.) *State* v. *Riley*, supra, 315 Conn. 658. *Casiano*, decided very shortly thereafter, instructs that the adjudicative process by which the judicial authority gives individualized consideration to these factors as part of the discretionary act of sentencing is fundamental to our system of justice. *Casiano* v. *Commissioner of Correction*, supra, 317 Conn. at 69–71.

As acknowledged in *Miller* and repeated in *Casiano*, "upon proper consideration of 'children's diminished culpability' . . . it would be 'uncommon' for a sentenc-

ing authority to impose the harsh penalty of a life sentence without parole." Id., 70, quoting *Miller* v. *Alabama*, supra, 567 U.S. 479. These cases, "in effect, set forth a presumption that a juvenile offender would not receive a life sentence without parole upon due consideration of the mitigating factors of youth . . . ." *Casiano* v. *Commissioner of Correction*, supra, 317 Conn. 70. Thus, "the individualized sentencing prescribed by *Miller*" necessarily "impact[s] the sentence imposed in most cases." Id.

In the present case, the defendant's eighty-five year sentence of imprisonment is presumptively disproportionate to his moral culpability because, if the trial court had considered the mitigating factors of the defendant's youth at the time of his commission of the offenses, as *Miller* requires, a lesser sentence likely would have been imposed. We do not know what that sentence would have been, of course, because the constitutional violation that occurred at the time deprives us of that knowledge. The majority opinion necessarily assumes that, if the constitutional requirements had been followed, the sentence would have been eighty-five years *with* the possibility of parole. Or, at least, it finds the use of such an assumption sufficient for remedial purposes, so that the retroactive availability of parole eliminates the need for a resentencing that complies with the requirements set forth in *Miller*, *Riley*, and *Casiano*. My disagreement with this approach exists on many levels, but it will be useful to express my disagreement in two parts. The first, addressed in part II A of this dissenting opinion, focuses on the particular ways that the parole eligibility conferred by § 1 of P.A. 15-84 is insufficient to remedy the disproportionate length of the defendant's sentence, and the second, addressed in part II B of this dissenting opinion, focuses on what I consider to be the fundamental conceptual flaws in the majority's position.

A

Providing parole eligibility is insufficient to remedy the disproportionate length of the defendant's sentence for four reasons. First, parole eligibility is dependent on the length of the sentence imposed, and, here, the defendant's lengthy sentence means that he is not eligible for parole until after he has served a minimum of thirty years of imprisonment. See P.A. 15-84, § 1, codified at General Statutes § 54-125a (f) (1) (B) (providing that "person . . . serving a sentence of more than fifty years" is not eligible for parole until "after serving thirty years"). If the defendant had been sentenced to a term of anything less than fifty years, he would be eligible for parole sooner—"after serving sixty per cent of the sentence or twelve years, whichever is greater." P.A. 15-84, § 1, codified at General Statutes § 54-125a (f) (1) (A). Second, once a defendant becomes eligible for parole, release is by no means guaranteed, because "the

decision to grant parole is entirely within the discretion of the [Board of Pardons and Paroles]." (Internal quotation marks omitted.) *Perez* v. *Commissioner of Correction*, 326 Conn. 357, 371, 163 A.3d 597 (2017). This leads to my third point, which is that the length of a defendant's sentence affects the likelihood that parole will be granted.[19] As the defendant points out, "an inmate serving an eighty-five year sentence will fare significantly worse [at a parole hearing] than other inmates who, for example, are serving fifty year sentences for committing similar, serious (homicide) offenses. Common sense would tell us that the greater the reduction requested, the less likely it would be that an inmate would receive relief at a parole hearing." Finally, once a person is released on parole, he or she nonetheless "remain[s] in the custody of the Commissioner of Correction and [is] subject to supervision by personnel of the Department of Correction during such person's period of parole." P.A. 15-84, § 1, codified at General Statutes § 54-125a (g). Thus, neither parole eligibility nor release on parole cures the violation of the defendant's eighth amendment right to be free from cruel and unusual punishment.

Although other states have enacted statutes or regulations to remedy *Miller* violations by providing for retroactive parole eligibility, many of these states expressly require the decision-making authority to consider a juvenile offender's diminished culpability at the time of the commission of the offense in deciding whether to grant parole. See Ark. Code Ann. § 16-93-621 (b) (2) (Supp. 2017) (requiring parole board to take into consideration, inter alia, "[t]he diminished culpability of minors as compared to that of adults," "[t]he hallmark features of youth," "[a]ge of the person at the time of the offense," and "[i]mmaturity of the person at the time of the offense"); Cal. Penal Code § 3051 (f) (1) (Deering Supp. 2018) (requiring parole board to "take into consideration the diminished culpability of youth as compared to that of adults" and "the hallmark features of youth"); W. Va. Code Ann. § 62-12-13b (b) (LexisNexis Supp. 2018) (requiring parole board to consider "[a]ge at the time of the offense," "[i]mmaturity at the time of the offense," and "[h]ome and community environment at the time of the offense"); Md. Code Regs. § 12.08.01.18 (3) (2016) (requiring parole commission to consider "[a]ge at the time the crime was committed," "[t]he individual's level of maturity and sense of responsibility at the time . . . the crime was committed," "[w]hether influence or pressure from other individuals contributed to the commission of the crime," "[t]he home environment and family relationships at the time the crime was committed," "[t]he individual's educational background and achievement at the time the crime was committed," and "[o]ther factors or circumstances unique to prisoners who committed crimes at the time the individual was a juvenile that the Commis-

sioner determines to be relevant"). For example, in *People* v. *Franklin*, 63 Cal. 4th 261, 370 P.3d 1053, 202 Cal. Rptr. 3d 496 (2016), the Supreme Court of California found parole eligibility under Cal. Penal Code § 3051 (f) (1) to be an adequate remedy for a *Miller* violation because, amongst other things, the statute directed "the [b]oard to give great weight to the diminished culpability of juveniles as compared to adults, the hallmark features of youth, and any subsequent growth and increased maturity of the prisoner . . . [and] contemplate[d] that information regarding the juvenile offender's characteristics and circumstances at the time of the offense will be available at a youth offender parole hearing to facilitate the [b]oard's consideration." (Citation omitted; internal quotation marks omitted.) Id., 283.

In contrast, P.A. 15-84 neither requires the Board of Pardons and Paroles (board) to give any special weight to the *Miller* factors and the diminished culpability of juvenile offenders, nor contemplates that such information will be available at a youth offender parole hearing to facilitate the board's decision.[20] Although the board may grant a juvenile offender parole if it finds that "such person has demonstrated substantial rehabilitation since the date such crimes or crimes were committed considering such person's character, background and history, as demonstrated by . . . the age and circumstances of such person as of the date of the commission of the crime or crimes, whether such person has demonstrated remorse and increased maturity since the date of the commission of the crime . . . [and] such person's efforts to overcome . . . obstacles that such person may have faced as a child"; P.A. 15-84, § 1, codified at General Statutes § 54-125a (f) (4) (C); this provision plainly is focused on a juvenile offender's rehabilitation, rather than a juvenile offender's diminished culpability. Parole eligibility under P.A. 15-84, in other words, is "future focused" and does not consider whether a juvenile offender "was less blameworthy due to their youth at the time of the offense." *State* v. *Link*, 297 Or. App. 126, 151, 441 P.3d 664 (2019); see id., 149–52 (holding that murder review hearing under Or. Rev. Stat. § 163.105 [2015] after thirty years of imprisonment did not "[provide] an opportunity for the consideration of the qualities of youth sufficient to comply with *Miller*" because [1] "*Graham* and *Miller* are replete with language holding that the proper actor to consider the qualities of youth is the *sentencer*," [2] "any consideration of the qualities of youth would come—at a minimum—[thirty] years after the imposition of the sentence" and "delay would undercut the essence of *Miller*," and [3] parole board is required to consider neither "immaturity at the time of the offense, nor how such immaturity lessened the culpability or blameworthiness of the defendant" [emphasis in original]). Because nothing in P.A. 15-84 requires the board to consider the *Miller* factors when deciding whether a

juvenile offender will spend the rest of his natural life in prison, I believe that parole eligibility under the statute is inadequate to remedy the violation of a juvenile offender's eighth amendment rights. See *Casiano* v. *Commissioner of Correction*, supra, 317 Conn. 70 ("the individualized sentencing prescribed by *Miller* is central to an accurate determination . . . that the sentence imposed is a proportionate one" [citation omitted; internal quotation marks omitted]); *State* v. *Riley*, supra, 315 Conn. 653 (holding that, under *Miller*, "the sentencer must consider age related evidence as mitigation when deciding whether to irrevocably sentence juvenile offenders to a lifetime in prison").

The inadequacy and unfairness of the retroactive aspect of P.A. 15-84, as applied to the defendant and any similarly situated juvenile offenders, is exacerbated by the disparate impact that *Miller* violations have on minority juvenile offenders. In written testimony submitted to the Joint Standing Committee on the Judiciary, the Center for Children's Advocacy explained that, "[e]ven though [b]lack and Latino youth comprise only 16% of Connecticut's total population, they represent 88% [of] all juvenile offenders serving sentences of more than [ten] years and 92% of youth sentenced to more than [fifty] years. Additionally, [b]lack and Latino youth serve longer sentences than when convicted of the same crime as their white counterparts." Conn. Joint Standing Committee Hearings, Judiciary, Pt. 2, 2015 Sess., p. 1048. Moreover, prior to the enactment of P.A. 15-84, "100% of juveniles serving a life sentence without parole [were] African Americans . . . ." Id., p. 1097, remarks of Subira Gordon, legislative analyst for the African American Affairs Commission. Thus, in Connecticut, it is minority youth who primarily are affected by the disproportionately long sentences meted out in violation of the requirements of *Miller*, and it is minority youth who continue to suffer the unconstitutional effects of these disproportionately long sentences.

The defendant in the present case was seventeen years old at the time of the commission of his crimes, and, under federal and Connecticut precedent, he has an eighth amendment right to have the mitigating factors of his youth, and his consequent diminished moral culpability, considered in determining whether he should spend the rest of his natural life imprisoned. Despite this constitutional right, the defendant has not had— and, under P.A. 15-84, never will have—an adjudicatory proceeding in which his diminished moral culpability is considered in relation to the length of his sentence. Because the parole eligibility conferred by P.A. 15-84 does not ensure "an accurate determination that the sentence imposed is a proportionate one"; *Casiano* v. *Commissioner of Correction*, supra, 317 Conn. 69; it fails to remedy the violation of the defendant's fundamental constitutional rights.[21]

## B

I have five broader points to make in response to the suggestion that the constitutional violation that occurred at the defendant's sentencing in June, 2003, is erased or cured by the legislature's provision of parole eligibility in 2015.

First, to repeat in the most basic terms what already has been said, it seems patently obvious that curing the *Graham* violation that occurred here does not address or cure the *Miller* violation that also occurred, because *Graham* and *Miller* concern two different aspects of the defendant's punishment. As I previously discussed, parole eligibility addresses the offender's potential for change and rehabilitation based on the scientific fact that the hallmarks of youth usually are transitory and will disappear over time. The individualized sentencing hearing mandated by *Miller* is necessary to take into account the hallmarks of youth as they relate to the offender's culpability, not his prospects for future rehabilitation, for purposes of deciding whether the defendant should be sentenced to thirty years, fifty years, or some other term of imprisonment. To suggest that parole eligibility erases or cures the *Miller* violation in a discretionary sentencing scheme strikes me as irrational when there is a distinct violation—one of watershed dimensions—that has independent consequences on the *length* of the sentence.

Second, unless it is willing to heighten the irrationality still more, the majority cannot brush aside the *Miller* violation inflicted on the defendant in 2003 on the theory that the violation disappears as a definitional matter because *Miller*, *Riley*, and *Casiano* apply only to sentences of life *without* parole, and the defendant is now serving a sentence of life *with* parole. To begin with, as a legal matter, the defendant is serving the very *same* sentence of eighty-five years of imprisonment that was imposed in 2003. Parole eligibility is not part of a defendant's sentence and, therefore, cannot cure a constitutional infirmity in the sentence. Parole eligibility, like other terms and conditions affecting how an inmate's sentence is implemented by the Department of Correction, is not within the jurisdiction of the sentencing judge or the Judicial Branch. See, e.g., *State* v. *McCoy*, 331 Conn. 561, 586–87, 206 A.3d 725 (2019) (clarifying and reiterating that "a trial court loses jurisdiction once the defendant's sentence is executed, unless there is a constitutional or legislative grant of authority"); *Perez* v. *Commissioner of Correction*, supra, 326 Conn. 371 (noting that "the decision to grant parole is entirely within the discretion of the board" and, therefore, "parole eligibility under [General Statutes] § 54-125a does not constitute a cognizable liberty interest sufficient to invoke habeas jurisdiction" [internal quotation marks omitted]). If the sentence itself was illegal, it remains illegal, because it has not changed. That point

is technical, although we often rely on technical points to reach our holdings in the field of criminal sentencing.

More fundamentally, it is remarkable to me that the majority is willing, with no apparent hesitation, to conclude that the entire corpus of juvenile sentencing law developed over the past fifteen years based on the revolutionary, paradigm-shifting insight that " 'children are different' " for sentencing purposes; *Casiano* v. *Commissioner*, supra, 317 Conn. 60; *State* v. *Riley*, supra, 315 Conn. 654; can be reduced to nothing more than the anemic requirement of parole eligibility.[22] It is not impossible to read the cases so narrowly, I suppose, but to arrive at that conclusion fights fiercely against the logic of those cases and the spirit animating them, especially as seen in *Riley* and *Casiano*. In my view, it is impossible to read our precedent to suggest that the foundational, animating, and essential principle of those cases is inapplicable to any sentence other than death or life without the possibility of parole. The profoundly significant principle that " 'children are constitutionally different from adults for sentencing purposes,' " embraced enthusiastically by this court in 2015; *Casiano* v. *Commissioner of Correction*, supra, 56; has been reduced to this disheartening reformulation: "Children are constitutionally the same as adults for sentencing purposes, even for the most severe sentences, short of death and its functional equivalent." The result is unfortunate and unnecessary. It also signals a major retreat from where our court positioned itself on the issue only four years ago, which brings us back to *Casiano*.

Third, the majority, in my view, vastly overstates the significance of the unremarkable fact that the legislature made the sentencing provisions contained in § 2 of P.A. 15-84 prospective, while giving the parole provisions in § 1 of P.A. 15-84 retroactive application. It is wholly unnecessary to read a preemptive remedial intention into that arrangement, and the fact that the legislature did not make § 2 retroactive across the board does not mean that it intended to strip judges of the authority to order resentencing on a case-by-case basis in the event that the juvenile offender was sentenced in violation of *Miller*. It would have made no sense to require resentencing in every case for the simple reason that some significant number of juvenile offenders within the retroactive scope of P.A. 15-84 would have been sentenced by trial judges who had taken into account the hallmarks of youth prior to 2015. The scientific basis for mandating—indeed, constitutionalizing— that procedure may not yet have been widely known before *Miller*, but many judges with sentencing responsibility undoubtedly were aware that children often lack adult-like judgment and impulse control, and these considerations were treated as a mitigating factor by some judges long prior to 2015. See *Roper* v. *Simmons*, supra, 543 U.S. 569 (noting that lack of maturity and underde-

veloped sense of responsibility found in youth is something "any parent knows"). Requiring resentencing in every case would not have been sensible, and it is hardly surprising that the legislature did not include a generic retroactivity provision in § 2 of P.A. 15-84.[23]

Fourth, the majority's claim that the passage of time makes resentencing not "practical" only serves to reinforce the impression that we have lost the courage of the convictions that we expressed in *Casiano*, in which we deemed the constitutional violation that occurred at the defendant's sentencing in 2003 a transgression of the most fundamental principles of individualized justice. *Casiano* v. *Commissioner of Correction*, supra, 317 Conn. 69–70. It strikes me as very odd that we so easily can shrug our shoulders now and say that "no remedy will put the defendant in the same position he would have been in if his youth had been considered when he was sentenced," and so we need not even try. Given the passage of time since the defendant's commission of the crimes in 2001, it is possible that some practical difficulties may arise during the resentencing process, but I cannot agree that this possibility relieves us of our obligation to provide a meaningful remedy for the constitutional violation that occurred at sentencing. "Constitutional violations implicating the courts must be susceptible of a judicial remedy." *Pamela B.* v. *Ment*, 244 Conn. 296, 313, 709 A.2d 1089 (1998). "Once a constitutional violation is found," a court is required to fashion a "remedy to fit the nature and extent of the constitutional violation." (Internal quotation marks omitted.) *Dayton Board of Education* v. *Brinkman*, 433 U.S. 406, 420, 97 S. Ct. 2766, 53 L. Ed. 2d 851 (1977).

The reality is that the resentencing of convicted offenders is neither a rare nor impractical remedy in numerous judicial contexts. At the federal level, tens of thousands of resentencing proceedings have been required over the past few years in the wake of various retroactive judicial rulings and sentencing reforms.[24] This remedial practice is by no means new; there have been watershed-like events in criminal procedure over the years requiring resentencing of offenders on a far more extensive scale than implicated here. See, e.g., W. Kelly, "Sentencing, Due Process, and Invalid Prior Convictions: The Aftermath of *United States* v. *Tucker*," 77 Colum. L. Rev. 1099 (1977) (discussing federal resentencings required in wake of *United States* v. *Tucker*, 404 U.S. 443, 92 S. Ct. 589, 30 L. Ed. 2d 592 [1972], which held that sentences cannot be enhanced by convictions obtained in violation of right to counsel under *Gideon* v. *Wainwright*, 372 U.S. 335, 83 S. Ct. 792, 9 L. Ed. 2d 799 [1963]). In Connecticut, resentencing is necessary in various contexts as well, including in habeas cases involving a successful claim of ineffective assistance of counsel, in which resentencing is required to "place the habeas petitioner, as nearly as possible, in the posi-

tion that he would have been in if there had been no violation of his right to counsel." (Internal quotation marks omitted.) *H. P. T.* v. *Commissioner of Correction*, 310 Conn. 606, 615, 79 A.3d 54 (2013). It makes no sense to me that we find ourselves working so hard to make this remedy unavailable in the present context involving the constitutional rights of children.

Fashioning remedies for constitutional violations sometimes presents courts with a "difficult task," but a meaningful remedy "is what the [c]onstitution and our cases call for, and that is what must be done in this case." *Dayton Board of Education* v. *Brinkman*, supra, 433 U.S. 420; see also *State* v. *Lyle*, 854 N.W.2d 378, 403 (Iowa 2014) (recognizing that resentencing juvenile offenders "will likely impose administrative and other burdens," but holding that those are "burdens our legal system is required to assume [because] [i]ndividual rights are not just recognized when convenient"). The Supreme Court of Iowa relied on this sound reasoning in a similar case and, in my view, its analysis should apply to a rule that we have deemed to constitute a "watershed rule" under Connecticut law: "Even if the resentencing does not alter the sentence for most juveniles, or any juvenile, the action taken by our [trial court] judges in each case will honor the decency and humanity embedded within [the state constitution] and, in turn, within every [citizen of the state]. The youth of this state will be better served when judges have been permitted to carefully consider all of the circumstances of each case to craft an appropriate sentence and give each juvenile the individual sentencing attention they deserve . . . . The [s]tate will be better served as well." *State* v. *Lyle*, supra, 403.

Fifth, and finally, if the majority means what it says here, then it should acknowledge that we really did not mean what we said in *Casiano* when we deemed *Miller* to establish a watershed rule of constitutional dimension. The language we employed in *Casiano* qualifies as more than a begrudging acceptance, more than a mild endorsement, more even than a firm embrace; it elevates the principle to the most revered constitutional status available. Indeed, the *Casiano* watershed designation confers constitutional status with meaning beyond the eighth amendment, because it triggers due process protection. The reason that a procedural rule of watershed significance requires retroactive application is that the right is deemed to be "implicit in the concept of ordered liberty," which is the touchstone used to identify rights entitled to protection as a matter of constitutional due process. (Internal quotation marks omitted.) *Albright* v. *Oliver*, 510 U.S. 266, 301, 114 S. Ct. 807, 127 L. Ed. 2d 114 (1994) (Stevens, J., dissenting); see id. (explaining that court initially held that "the right to be free from unreasonable official searches was 'implicit in "the concept of ordered liberty,"' and therefore protected by the [d]ue [p]rocess [c]lause of

the [f]ourteenth [a]mendment," and that court later " 'extend[ed] [those] *substantive* protections of due process to all constitutionally unreasonable searches— state or federal' " [emphasis in original]); *Herrera* v. *Collins*, 506 U.S. 390, 435–36, 113 S. Ct. 853, 122 L. Ed. 2d 203 (1993) ("This [c]ourt has held that the [d]ue [p]rocess [c]lause protects individuals against two types of government action. So-called substantive due process prevents the government from engaging in conduct that shocks the conscience . . . or interferes with rights implicit in the concept of ordered liberty . . . . When government action depriving a person of life, liberty, or property survives substantive due process scrutiny, it must still be implemented in a fair manner. . . . This requirement has traditionally been referred to as procedural due process." [Citations omitted; internal quotation marks omitted.]); *Palko* v. *Connecticut*, 302 U.S. 319, 325, 58 S. Ct. 149, 82 L. Ed. 288 (1937) (equating rights that are "the very essence of a scheme of ordered liberty" with " 'principle[s] of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental' ").[25]

The *Casiano* watershed designation and its constitutional entailments cannot be ignored; nor can it be suggested with a straight face that the procedural right to an individualized hearing before the sentencing court is owed the most robust constitutional protection available when a juvenile offender is sentenced to life in prison without parole, but suddenly warrants no constitutional protection at all if the offender receives an identical sentence with the possibility of parole.

I therefore dissent.

[1] The watershed label, which triggers retroactive application of the new rule, describes an "extremely narrow" class of cases arising so rarely that the United States Supreme Court itself "has never held that any rule falls within the exception." (Internal quotation marks omitted.) *Lester* v. *United States*, 921 F.3d 1306, 1308 (11th Cir. 2019).

[2] Section 1 of No. 15-84 of the 2015 Public Acts, codified at General Statutes § 54-125a, provides in relevant part: "(f) (1) Notwithstanding the provisions of subsections (a) to (e), inclusive, of this section, a person convicted of one or more crimes committed while such person was under eighteen years of age, who is incarcerated on or after October 1, 2015, and who received a definite sentence or total effective sentence of more than ten years for such crime or crimes prior to, on or after October 1, 2015, may be allowed to go at large on parole in the discretion of the panel of the Board of Pardons and Paroles for the institution in which such person is confined, provided (A) if such person is serving a sentence of fifty years or less, such person shall be eligible for parole after serving sixty per cent of the sentence or twelve years, whichever is greater, or (B) if such person is serving a sentence of more than fifty years, such person shall be eligible for parole after serving thirty years. Nothing in this subsection shall limit a person's eligibility for parole release under the provisions of subsections (a) to (e), inclusive, of this section if such person would be eligible for parole release at an earlier date under any of such provisions.

"(2) The board shall apply the parole eligibility rules of this subsection only with respect to the sentence for a crime or crimes committed while a person was under eighteen years of age. . . .

"(3) Whenever a person becomes eligible for parole release pursuant to this subsection, the board shall hold a hearing to determine such person's suitability for parole release. . . .

"(4) After such hearing, the board may allow such person to go at large on parole with respect to any portion of a sentence that was based on a

crime or crimes committed while such person was under eighteen years of age if the board finds that such parole release would be consistent with the factors set forth in subdivisions (1) to (4), inclusive, of subsection (c) of section 54-300 and if it appears, from all available information, including, but not limited to, any reports from the Commissioner of Correction, that (A) there is a reasonable probability that such person will live and remain at liberty without violating the law, (B) the benefits to such person and society that would result from such person's release to community supervision substantially outweigh the benefits to such person and society that would result from such person's continued incarceration, and (C) such person has demonstrated substantial rehabilitation since the date such crime or crimes were committed considering such person's character, background and history, as demonstrated by factors, including, but not limited to, such person's correctional record, the age and circumstances of such person as of the date of the commission of the crime or crimes, whether such person has demonstrated remorse and increased maturity since the date of the commission of the crime or crimes, such person's contributions to the welfare of other persons through service, such person's efforts to overcome substance abuse, addiction, trauma, lack of education or obstacles that such person may have faced as a child or youth in the adult correctional system, the opportunities for rehabilitation in the adult correctional system and the overall degree of such person's rehabilitation considering the nature and circumstances of the crime or crimes.

"(5) After such hearing, the board shall articulate for the record its decision and the reasons for its decision. If the board determines that continued confinement is necessary, the board may reassess such person's suitability for a new parole hearing at a later date to be determined at the discretion of the board, but not earlier than two years after the date of its decision.

"(6) The decision of the board under this subsection shall not be subject to appeal. . . ."

[3] Extraordinary only in America, I should add. It is no point of pride that we are one of only one or two countries in the world that permits a juvenile offender to be sentenced to life without parole. See C. de la Vega & M. Leighton, "Sentencing Our Children to Die in Prison: Global Law and Practice," 42 U.S.F. L. Rev. 983, 985 (2008) (engaging in comparative analysis of juvenile justice and rehabilitation models). "These issues have become so [well understood] at the international level," explain the authors of this article, "that a state's execution of [the life without parole] sentence raises the possibility that it not only violates juvenile justice standards but also contravenes international norms established by the United Nations Convention Against Torture. Globally, the consensus against imposing [life without parole] sentences on children is virtually universal. Based on the authors' research, there is only one country in the world today [as of 2008] that continues to sentence child offenders to [life without parole] terms: the United States." (Footnote omitted.) Id., 985. A different source indicates that one other country shares this dubious distinction, at least as of 2005. That country is Somalia. See Amnesty International, Human Rights Watch, "The Rest of Their Lives: Life Without Parole for Child Offenders in the United States," (2005), p. 5, available at http://www.hrw.org/sites/default/files/reports/TheRestofTheirLives.pdf (last visited August 22, 2019) ("all countries except the United States and Somalia have ratified the Convention on the Rights of the Child, which explicitly forbids 'life imprisonment without possibility of release' for 'offenses committed by persons below eighteen years of age' "). It appears that our system of justice, in some ways a model envied and emulated around the globe, lags behind the vast majority of other countries with respect to our treatment of juvenile offenders. And if Nelson Mandela spoke the truth when he said that "[t]here can be no keener revelation of a society's soul than the way in which it treats its children," then our failure to keep pace with practices elsewhere in this regard should be viewed as profoundly disturbing.

[4] In *Roper, Graham,* and *Miller,* the United States Supreme Court relied on this growing body of scientific and social science evidence to establish the constitutionally significant differences between adults and juveniles. See *Miller* v. *Alabama,* supra, 567 U.S. 472 n.5 ("[t]he evidence presented to us in these cases indicates that the science and social science supporting *Roper*'s and *Graham*'s conclusions have become even stronger"). Children are different, the court explained, in significant part because their brains are not yet fully developed or fully functioning. See *Graham* v. *Florida,* supra, 560 U.S. 68 (noting that "developments in psychology and brain science continue to show fundamental differences between juvenile and

adult minds"). The various anatomical structures and neurochemical systems that govern decision making and impulse control not only remain undeveloped in adolescents, but develop at different rates within the brain, and this developmental mismatch is responsible for some of the most significant impairments, such as impulsivity and lack of judgment and self-control, so often observed in juveniles. See *Miller* v. *Alabama*, supra, 472 n.5. The American Psychiatric Association (APA) submitted an amicus curiae brief in *Miller* providing an extensive review of the science and social science demonstrating these points. Id. (quoting APA's amicus brief for proposition that " '[i]t is increasingly clear that adolescent brains are not yet fully mature in regions and systems related to higher-order executive functions such as impulse control, planning ahead, and risk avoidance' "). In the present case, a similar brief was filed by amicus curiae Connecticut Psychiatric Society, which focused on the post-*Miller* literature further establishing the scientific basis for treating children differently from adults for the purposes of criminal sentencing.

[5] The defendant was convicted in 2003 of murder in violation of General Statutes § 53a-54a (a), conspiracy to commit murder in violation of General Statutes §§ 53a-54a (a) and 53a-48 (a), and assault in the first degree in violation of General Statutes § 53a-59 (a) (5), after he and his younger half brother shot and killed the victim and injured another individual in 2001. *State* v. *McCleese*, 94 Conn. App. 510, 511–12, 892 A.2d 343, cert. denied, 278 Conn. 908, 899 A.2d 36 (2006). The defendant "conspired to murder [the victim] . . . because the defendant believed that [the victim] was 'messing with' [his younger brother]." Id., 512. The trial court imposed a sixty year sentence on the murder count, a consecutive twenty year sentence on the conspiracy count, and a consecutive five year sentence on the assault count, resulting in a total effective sentence of eighty-five years.

[6] At the hearing on the defendant's motion to correct an illegal sentence, the trial court asked the state if it was disputed that the sentencing judge "[did not] follow the mandates of *Miller* v. *Alabama* in what should be considered by a judge when sentencing [a juvenile offender] . . . [i]n other words . . . the [sentencing] court did not factor in all the things that *Miller* v. *Alabama* now requires?" The state answered: "Correct. . . . [T]hose factors were not taken into consideration." This clarifying colloquy followed:

"The Court: I mean, I'm not saying that the [judge] did not mention at some point, you know, which normally they do in sentencing, the youth of somebody, but . . . the sentencing [judge] didn't address in the detail and form in which *Miller* v. *Alabama* requires is what—

"[The Prosecutor]: That is correct, Your Honor. . . . Age may have been mentioned, but not in any detail as required under those cases."

[7] No fault is attributable to the sentencing court here. As I previously noted, the sentencing proceeding took place in 2003, nine years before *Miller* and twelve years before this court decided *Riley*. There is no evidence in the record that the defendant at sentencing submitted or referenced any of the scientific studies or raised any legal claim on the basis of those studies.

[8] Although the rehabilitative strand is found in *Roper*, *Graham*, and *Miller*, the doctrinal expression of the rule is most closely associated with *Graham*, and a sentence that satisfies the requirement of parole eligibility is often referred to as "*Graham* compliant." See, e.g., *Willbanks* v. *Dept. of Corrections*, 522 S.W.3d 238, 256 (Mo.) (discussing *Riley* and its requirement of "a *Graham*-compliant sentence"), cert. denied,     U.S.    , 138 S. Ct. 304, 199 L. Ed. 2d 125 (2017).

[9] Our focus here is on punishment, but the concept of moral culpability also is fundamental to the determination of criminal liability. "The contention that an injury can amount to a crime only when inflicted by intention is no provincial or transient notion. *It is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil.*" (Emphasis added.) *Morissette* v. *United States*, 342 U.S. 246, 250, 72 S. Ct. 240, 96 L. Ed. 288 (1952); see also R. Pound, Introduction to F. Sayre, A Selection of Cases on Criminal Law (1927), pp. xxxvi–xxxvii ("Historically, our substantive criminal law is based [on] a theory of punishing the vicious will. It postulates a free agent confronted with a choice between doing right and doing wrong and choosing freely to do wrong.").

[10] See *Casiano* v. *Commissioner of Correction*, supra, 317 Conn. 60, 68–70; *State* v. *Riley*, supra, 315 Conn. 646–51.

[11] The cases sometimes attribute the importance of assessing culpability to generic penological goals such as retribution; see, e.g., *Miller* v. *Alabama*, supra, 567 U.S. 472; and at other times to the eighth amendment "proportionality" requirement. See, e.g., id., 469–71, 473.

[12] It is important to understand at the outset that the court in *Montgomery* could not, as a matter of federal law, establish limitations on Connecticut's

ability to provide a remedy for a *Miller* violation that is more generous than that provided by federal courts. See *Danforth* v. *Minnesota*, supra, 552 U.S. 288 (holding that "the remedy a state court chooses to provide its citizens for violations of the [f]ederal [c]onstitution is primarily a question of state law"). This point is discussed shortly.

[13] For the sake of simplicity, I adopt the majority's use of the shorthand phrases "*Graham* violation" and "*Miller* violation." See footnote 3 of the majority opinion. A *Graham* violation refers to a sentencing court's failure to account for the likelihood of rehabilitation by providing a juvenile offender with parole eligibility; a *Miller* violation refers to a sentencing court's failure to take into account the "hallmarks of youth" in determining the most appropriate term of incarceration proportional to the trial court's assessment of the offender's moral culpability and related penological objectives. *State* v. *Delgado*, supra, 323 Conn. 806 n.5.

[14] This individualized sentencing hearing is the proceeding that we have deemed to be essential to the fundamental fairness of the judicial proceeding, central to an accurate determination of a proportionate sentence, and implicit in the very idea of ordered liberty. *Casiano* v. *Commissioner of Correction*, supra, 716 Conn. 70–71.

[15] See also Conn. Joint Standing Committee Hearings, Judiciary, Pt. 2, 2015 Sess., p. 943, remarks of Chief State's Attorney Kevin Kane (stating that "the Connecticut Supreme Court went a little farther [in *Riley*] than I ever thought the U.S. Supreme Court intended to go in *Graham* and *Miller*"); id., p. 959, remarks of former Representative Robert Farr (agreeing that *Riley* "went beyond the U.S. Supreme Court decision" in *Miller*).

[16] *Montgomery* did not reach the issue.

[17] The majority opinion criticizes the scope of my analysis on the ground that "[t]he defendant never has advanced any of the dissent's arguments," and states that the court should decline to decide this case "based on issues not raised by the parties." I disagree that the ground I cover is outside the scope of the claims raised by the defendant. The defendant argued in his initial brief that the remedial component of *Montgomery* v. *Louisiana*, supra, 136 S. Ct. 718, is not binding on this court pursuant to *Danforth* v. *Minnesota*, supra, 552 U.S. 280–81; that resentencing is required as a matter of state law under *Casiano* v. *Commissioner of Correction*, supra, 317 Conn. 70–71, which designated *Miller* a watershed rule of criminal procedure; that the sentencing judge, not the Board of Pardons and Parole, has the constitutional obligation to sentence the defendant on the basis of an individualized assessment of the *Miller* factors; and that concerns about practicality cannot outweigh the fundamental rights at stake. After the defendant filed his initial brief, this court issued its decision in *State* v. *Delgado*, supra, 323 Conn. 801. The defendant thereafter filed a reply brief in which he argued that "[t]his court should reconsider and overrule" *Delgado* because "*Delgado* was decided when the law was in flux, without full briefing of the issues, and the decision is 'incorrect and unjust.' " To the extent that this dissenting opinion may expand on certain arguments made by the defendant, or draw out additional significance or different implications on the basis of arguments that come within the scope of the defendant's claims, I see nothing improper or unusual about doing so. Cf. *Michael T.* v. *Commissioner of Correction*, 319 Conn. 623, 635 n.7, 126 A.3d 558 (2015) (distinguishing between "claim[s]" and "argument[s]" and noting that appellate courts may review "legal arguments that . . . are subsumed within or intertwined with arguments related to the legal claim" [internal quotation marks omitted]).

Finally, because I would conclude that the parole eligibility conferred by P.A. 15-84 was not intended to remedy the violation of juvenile offenders' constitutional rights at sentencing pursuant to *Miller*, I do not address the question of whether the legislature can, without violating the separation of powers enshrined in article second of the state constitution, modify a defendant's sentence to remedy a *Miller* violation. It is an open question whether the legislature would transgress constitutional limitations were P.A. 15-84 construed to either (1) delegate to the Board of Pardons and Paroles, an agency wholly outside of the Judicial Branch, the authority to exercise an act of sentencing discretion already conferred to the Judicial Branch, or (2) preempt the judiciary from requiring resentencing to remedy a constitutional violation committed by a judicial officer exercising his judicial discretion in a judicial proceeding. See Conn. Const., art. II ("[t]he powers of government shall be divided into three distinct departments, and each of them confided to a separate magistracy, to wit, those which are legislative, to one; those which are executive, to another; and those which are judicial, to another"). I do not read the majority's separation of powers discussion

to address these particular points, because its view, following *Delgado*, is that parole eligibility *negates* the *Miller* violation, thus making resentencing unnecessary.

[18] Teenage children unquestionably are capable of making moral choices and conform their conduct accordingly. We are speaking about matters of degree. The physiological and psychological impediments at issue, moreover, are not distributed in equal shares to all juveniles.

[19] The length of a defendant's sentence also affects an inmate's classification, which is used to "determine the inmate's appropriate confinement location, treatment, programs and employment assignment whether in a facility or the community." (Internal quotation marks omitted.) *Anthony A.* v. *Commissioner of Correction*, 326 Conn. 668, 671–72 and n.3, 166 A.3d 614 (2017), quoting Department of Correction, Administrative Directive 9.2 (3) (a) (effective July 1, 2006).

[20] The majority opinion points out that the board has explained in an annual report that it gives " 'great weight to the diminished culpabilities of juveniles as compared to adults, the hallmark features of youth, and any subsequent growth and maturity that has been displayed when considering an offender for suitability.' " See footnote 12 of the majority opinion. This statement carries no legal force, of course, because the directive is not contained in any administrative regulation or in P.A. 15-84. In any event, parole eligibility is not an adequate substitute for a *Miller*-compliant resentencing by a judge.

[21] The violation that I would find occurred in this case likely would carry implications for a relatively small number of similarly situated juvenile offenders. As of March, 2015, there were "approximately 200 people [in Connecticut] serving sentences of more than [twelve] years for crimes committed under the age of [eighteen]. About [fifty] are serving [fifty] years or more." Conn. Joint Standing Committee Hearings, supra, p. 953, remarks of Professor Sarah F. Russell. The record does not disclose how many of these individuals are serving sentences imposed after sentencing hearings that did not comply with *Miller*.

[22] I say "anemic" because such a narrow reading leaves us virtually alone, among all countries in the world, in the severity of our juvenile sentencing jurisprudence. See footnote 3 of this dissenting opinion.

[23] Based on the chronology of events, it appears exceedingly unlikely that the legislature was aware of this court's decision in *Casiano* and its designation of *Miller* as a watershed rule of criminal procedure at the time P.A. 15-84 was enacted. The *Casiano* decision officially was released on May 26, 2015, the very same day that the House of Representatives passed the final version of the bill that became P.A. 15-84. See 58 H.R. Proc., Pt. 15, 2015 Sess., p. 4917. The Senate had passed the bill over a month earlier, on April 22, 2015. See 58 S. Proc., Pt. 3, 2015 Sess., p. 734. It was required to vote again, on May 29, 2015, because the House had adopted a minor amendment to the bill immaterial to the present appeal. See 58 S. Proc., Pt. 8, 2015, p. 2646; see also 58 H.R. Proc., supra, p. 4910 (summarizing Senate Amendment Schedule "A"). The transcript of the proceedings demonstrates that the May 29 Senate vote was little more than a formality—there was no further discussion of the merits of the bill and certainly no mention of the newly released *Casiano* decision.

[24] For example, in 2014, the United States Sentencing Commission promulgated Amendment 782, commonly known as the "drugs-minus-two" amendment, which was retroactively applicable to criminal defendants convicted of certain drug offenses and resulted in "approximately 40,000 federal prisoners eligible to seek shorter sentences." J. Haile, "Farewell, Fair Cruelty: An Argument For Retroactive Relief in Federal Sentencing," 47 U. Tol. L. Rev. 635, 640 (2016). As a result of Amendment 782, "approximately 30,000 individuals had their sentences reduced, with an average decrease of [twenty-five] months." C. Devins, "Lessons Learned From Retroactive Resentencing After *Johnson* and Amendment 782," 10 Fed. Cts. L. Rev. 39, 45 (2018). More recently, in *United States* v. *Johnson*,      U.S.     , 135 S. Ct. 2551, 192 L. Ed. 2d 569 (2015), the United States Supreme Court held that the residual clause definition of a "violent felony" in the Armed Career Criminal Act (ACCA), 18 U.S.C. § 924 (e) (2) (B), was unconstitutionally vague, resulting in a 334 percent increase in the filing of motions to vacate, set aside or correct sentences under 28 U.S.C. § 2255, and a 312 percent increase in the filing of "second or successive collateral challenges under 28 U.S.C. § 2244" in the federal courts. C. Devins, supra, 10 Fed. Cts. L. Rev. 54–55. Pursuant to *Johnson* and *Welch* v. *United States*,      U.S.     , 136 S. Ct. 1257, 1265, 194 L. Ed. 2d 387 (2016) (holding that *Johnson* was "a substantive decision

and so has retroactive effect . . . in cases on collateral review"), criminal defendants "eligible for relief [are] entitled to resentencing without the ACCA's residual clause." C. Devins, supra, 10 Fed. Cts. L. Rev. 87. "Although the Sentencing Commission estimates that *Johnson* resulted in sentence reductions for [only] about 1,200 inmates nationwide, these cases are likely underreported and . . . the actual number could be much higher." (Footnote omitted.) Id., 80.

[25] See T. Darden, "Constitutionally Different: A Child's Right to Substantive Due Process," 50 Loy. U. Chi. L.J. 211, 267–68 (2018) ("[a] permeating substantive due process right based on age status and its attendant disadvantages in achieving fundamental fairness at certain stages of the justice process seems aligned with fully interpreting the juvenile sentencing cases").